***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence affirms with some modifications the Opinion and Award of the deputy commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the deputy commissioner as:
 STIPULATIONS
1. Plaintiff was employed by defendant-employer at the time of the alleged injury.
2. Allied Claims Administration was the administrator on the risk at the time of the alleged injury.
3. The date of plaintiff's alleged injury was September 24, 2002.
4. The parties were subject to and bound by the North Carolina Workers' Compensation Act at the time of the alleged injury, the employer employing the requisite number of employees to be bound under the provisions of said Act.
5. Plaintiff's average weekly wage is to be determined by a Form 22.
 ***********
Based on the foregoing Stipulations and the evidence presented, the Full Commission finds the following:
 FINDINGS OF FACT
1. At the time of the hearing, plaintiff was 35 years of age. She completed high school and three years of college at North Carolina State University. On September 24, 2002, plaintiff was working full-time at Oakwood Medical Center as an insurance supervisor and part-time for defendant-employer as a computer operator where she wrote reports, distributed reports and did troubleshooting. Based on the Form 22 in evidence, plaintiff's average weekly wage at her employment with defendant-employer was $224.35, yielding a compensation rate of $149.57.
2. Plaintiff sustained an injury on September 24, 2002 while she was working at her part-time job with defendant-employer. She was working on her 5:00 p.m. to 11:00 p.m. shift. Between 9:30 and 9:45 she stood up from a chair in which she had been sitting for a long time and fell down on her knees. Plaintiff testified that, "I stood up and lost my balance and fell down on my knee." Plaintiff could not explain why she fell except that her right leg might have gone to sleep after sitting in her chair approximately three hours. She was specifically asked, "How did you happen to lose your balance." Plaintiff responded, "I guess my leg-I think my leg went to sleep on me, but I really, you know, can't recall." Plaintiff further testified that her leg had not gone to sleep on her at all over the prior year and that maybe sitting for approximately two to three hours caused her leg to go to sleep on the night of September 24, 2002. During a six-hour shift on weeknights, plaintiff was required to sit approximately four hours, and on weekends when she worked eight hours for defendant-employer, she was required to sit approximately six hours at a time. At the time of her fall, plaintiff was getting up to prepare for reports that come off about 10 o'clock.
3. Plaintiff was initially treated at Nash General Hospital Emergency Room where she reported, "attempted to get up from sitting, leg asleep, fell and twisted right knee." J. Greg Nelson, M.D., orthopaedist, diagnosed her as having a right knee dislocation with internal derangement of the knee. Plaintiff was then airlifted to Pitt Memorial Hospital due to loss of pulse in her right foot.
4. At Pitt Memorial, on September 24, 2002, an angiogram of plaintiff's right leg was performed which revealed an intimal dissection and thrombosis of the right popliteal artery following a right knee dislocation. Later that day or early in the morning of the next day, Dr. Phillip M. Brown, a vascular surgeon, performed a right popliteal artery exploration and reversed saphenous vein graft interposition repair of the right popliteal artery. Dr. Brown described this procedure as an exploration of the injured artery and a repair of that artery with a graph made out of plaintiff's own saphenous vein. The surgery from a vascular standpoint was successful, but it was only a small part of plaintiff's overall injury. Dr. Brown was of the opinion that the dislocation of plaintiff's knee led to the arterial injury.
5. On September 26, 2002, an MRI was performed on plaintiff's right knee that was read by Dr. Melissa B. Duncan, a radiologist. Dr. Duncan found extensive ligamentous injury, torn anterior and posterior cruciate ligaments (ACL and PCL), posterior capsular disruption, MCL strain, possible tear of the lateral collateral ligament, tear of the popliteus tendon, tear of the posterior horn of the lateral meniscus, extensive soft tissue edema throughout the knee, particularly in the popliteal fossa region, mild to moderate osteoarthritis, with Grade II-III changes of chondromalacia patella affecting the inferior pole portion, and cartilage thinning or defect with subchondral changes and perhaps also mild marrow edema involving the trochlear groove aspect of the medial femoral condyle.
6. Also on September 26, 2002, plaintiff was examined by Dr. Tally E. Lassiter, an orthopaedist. After review of her history and arteriogram, Dr. Lassiter found that plaintiff had ACL and PCL tears with remaining attachment of the PCL to the tibia and that it appeared there was more damage on the lateral side involving the popliteus tendon and lateral collateral ligament arcuate complex. Dr. Lassister had not seen the MRI report. His impression was that plaintiff had a knee dislocation with vascular injury, now revascularized. He recommended repair of the lateral structures of the knee in one to two weeks and that the ACL and PCL be repaired later.
7. On October 2, 2002, Dr. Lassiter performed surgery to repair the lateral collateral ligament (LCL) of plaintiff's right knee. He repaired the lateral ligaments with what he called allograft tendon which was made from a cadaver, and it seemed to give plaintiff good lateral stability.
8. After the surgery, Dr. Lassiter felt that plaintiff had healed in the lateral side but that she needed to wear a brace for a while. He recommended that plaintiff have the remaining ligaments repaired within six to eight weeks; however, plaintiff didn't have many complaints or much trouble with the ligaments, and therefore did not deem it necessary to have them repaired. Dr. Lassiter felt that if plaintiff did not have the ligaments repaired, her knee was likely to be unstable and liable to buckle on her, and plaintiff would be likely to fall and tear the menisci or cartilages as well.
9. As a result of her injury from her fall, plaintiff was unable to work for defendant-employer from September 25, 2002 through January 24, 2003; and, she was unable to work in her full time employment from September 25, 2002 through October 22, 2002.
10. On December 30, 2002, Dr. Lassiter gave plaintiff a light duty work note limiting her to carrying twenty pounds, with no stair or ladder climbing and no crawling. There was no date in terms of how long the restrictions would remain in effect.
11. In October of 2002, Dr. Lassiter prescribed Percocet and later Ibuprofen and Oxycodone for relief of plaintiff's pain. He noted that plaintiff wore the brace for a long time and did not really test her knee; plaintiff hobbled around. Dr. Lassiter last treated plaintiff on April 7, 2003, at which time plaintiff's knee was quite lax from front to back. She needed further surgery to repair the ACL and PCL ligaments to decrease her chance of recurring injury, to delay or prevent early arthritis and to decrease her risk of total knee replacement.
12. Based on Dr. Lassiter's recommendation of further surgery, plaintiff's history, his physical examination and treatment of plaintiff, including his observations of the progress she had made, Dr. Lassiter opined that plaintiff will probably develop arthritis in the knee, instability, and be at risk for falling and breaking a wrist or hip or something of that nature because she does not have a knee that is trustworthy.
13. Dr. Lassiter further opined and the Full Commission so finds, that the fall plaintiff sustained on September 24, 2002 caused plaintiff's knee injury based upon her history, the loss of her pulse after the fall, and the fact that revascularization occurred after the fall.
14. Dr. Lassiter opined that the injury plaintiff received, could or might result in temporary total disability for a length of time. At a minimum, if plaintiff had a job where she could sit with her leg propped up, she may have been able to go back to work in a month to six weeks.
15. Dr. Lassiter opined that the injury for which he treated plaintiff could or might have resulted in permanent partial disability of the knee of fifty percent (50%). This rating was due to instability of the knee and ligament injury only. The rating did not take into consideration the vascular injury for which Dr. Brown treated plaintiff.
16. Dr. Lassiter further opined that the medical care provided to plaintiff has given her relief for knee symptoms associated with her fall and that he should be able to improve her stability with successful surgery, such that she can return to a medium level work capacity.
17. Dr. Lassiter also addressed the issue of plaintiff's overweight status. He opined that plaintiff's weight increases the likelihood that a misstep could cause a dislocation of her knee, and places her at a four times increased risk of needing knee replacement surgery. He did not think having the ACL and PCL repaired would "necessarily prevent deterioration of the joint because the trauma that occurs at the time of injury is such that that may — you may have already set off a cascade of events that makes it impossible to prevent it even if you stabilize the knee, nonetheless, the symptoms that might cause a patient to have to have a knee replacement, i.e. instability and pain, would probably be delayed for five, ten, fifteen years perhaps — that — by fixing the ligament. But ultimately, the arthritis would probably come in any case."
18. Dr. Brown opined that although Plaintiff had essentially recovered to normal from a vascular standpoint that plaintiff is at a slightly increased risk of lower extremity ischemia if she were to get a stenosis at one of the anastomoses, which is where the vein graph is put into place at the injured artery. Dr. Brown further testified that problems might develop within two years, so they have tried to keep close track with ultrasound.
19. Dr. Brown opined with "what approaches a hundred percent certainty that her knee dislocation was because [the cause] of the injury to her artery." Dr. Brown also stated that plaintiff would normally be out of work four to six weeks due to this injury. At the time of hearing on September 23, 2003, plaintiff continued to suffer from instability in both knees, swelling in her right knee when she walks too much, difficulty with lifting more than 10 pounds, inability to squat, problems with standing more than 30 minutes and problems when walking more than 1 mile.
20. Dr. Brown was of the opinion that the knee dislocation caused the arterial injury and that the dislocation, not plaintiff's weight, was the main factor in her arterial injury. He opined that plaintiff's injury did not indicate any type of circulatory problem and was not due to a mental or physical condition.
21. Plaintiff returned to work at Oakwood Medical Center on October 22, 2002 and at Nash General Hospital on January 25, 2003 at the same rate of pay as she was receiving prior to her injury on September 24, 2002.
22. As a result of her fall on September 24, 2002, the plaintiff sustained right knee and vascular injuries for which she required surgery by Dr. Lassiter on October 2, 2002 and Dr. Brown on September 24, 2002.
23. As a result of her injuries from the fall, the plaintiff was temporarily totally disabled from September 24, 2002 through January 25, 2003 and sustained a fifty percent (50%) permanent partial impairment to her right leg.
24. Defendants do not dispute that the plaintiff's injuries from the fall occurred in the course of her employment and resulted from an accident. The disputed issue is whether the injury arose out of the employment.
25. Plaintiff's testimony at hearing that she stood up, lost her balance and fell would support a finding that her injury arose out of her employment. Defendants contend, however, that there is no causal connection between plaintiff's fall and her employment and that plaintiff's injury resulted solely from an idiopathic condition. In plaintiff's reports of how her injury occurred to her employer and medical providers, she appears to have stated that her leg fell asleep and she fell when she stood up. The written accounts of what plaintiff reported vary to some degree. In her recorded statement, plaintiff indicated that she had taken 1 step before she fell. When asked what is medically going on when a person says their leg has fallen asleep, Dr. Brown testified as follows:
 A. It could be any — any one of a number of things. You know, most commonly in just, like any of us have had, sitting in one position for a period of time and you know, if you put a little pressure on a nerve or something like that, I mean you get those pins and needles feeling in your leg. And that's usually what people mean but, you know, there's no medical opinion as to what that is, I mean, that's sort of a — what everybody kind of knows phenomenon.
26. Dr. Brown further testified that one's leg falling asleep would not commonly indicate a circulatory problem. In response to questions, Dr. Brown testified that it would be fair to say that a person's leg falling asleep is an idiopathic condition that can occur from time to time in any person and can perhaps cause a person to fall. Dr. Brown cautioned, however, that he was not answering from a medical standpoint, but more of what makes sense.
27. Plaintiff's working condition which required her to sit for long periods of time created a natural and probable risk that her leg would cause a problem when she stood up and thus contributes to a fall. The fall was not due to plaintiff physical or mental condition. Therefore, the Full Commission finds plaintiff's fall was not independent of, or unrelated to her employment.
28. Additionally, plaintiff's testimony at hearing establishes that she does not know why she fell. She only knows that she stood up, lost her balance and fell down presumably due to her leg falling asleep. At the time of her fall, plaintiff was getting up from a seated position to perform a duty related to her employment. Based on the greater weight of the evidence, plaintiff's injury arose out of her employment. Plaintiff's at hearing testimony is accepted as credible.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. Plaintiff's right knee and vascular injuries were sustained as a result of the fall at work on September 24, 2002, which is an injury by accident that arose out of and in the course and scope of plaintiff's employment with defendant-employer. N.C. Gen. Stat. § 97-2(6). Robbinsv. Bossong Hosiery Mills, 220 N.C. 246 (1941).
2. On or about September 24, 2002, plaintiff's average weekly wage was $224.35 while employed by Nash General Hospital, yielding a compensation rate of $149.57.
3. As a result of her injury by accident, plaintiff is entitled to be paid by defendant temporary total disability compensation at the rate of $149.57 per week for the period September 24, 2002 through January 25, 2003. N.C. Gen. Stat. § 97-29.
4. As a result of her injury by accident, plaintiff is entitled to be paid by defendant permanent partial disability compensation for the fifty percent (50%) impairment of her right leg, payable at the compensation rate of $149.57 per week for 100 weeks. N.C. Gen. Stat. § 97-31.
5. As a result of her injury by accident, plaintiff is entitled to have defendant pay for all of her medical expenses incurred or to be incurred for all injuries resulting from said injury by accident. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission awards the following:
 AWARD
1. Defendant shall pay plaintiff temporary total disability compensation at the rate of $149.57 per week from September 24, 2002 through January 25, 2003. This compensation shall be paid to plaintiff in a lump sum.
2. Defendant shall pay plaintiff permanent partial disability compensation at the rate of $149.57 per week for 100 weeks for the fifty percent (50%) impairment of her right leg.
3. Defendant shall pay all of plaintiff's medical expenses incurred or to be incurred as a result of plaintiff's injury of September 24, 2002.
4. A reasonable attorney's fee in the amount of twenty-five percent (25%) of the compensation awarded to plaintiff in paragraphs 1 and 2 is approved for counsel for plaintiff.
5. Defendants shall pay the costs.
This the 16th day of December 2005.
 S/ ______________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/ ______________________ CHRISTOPHER SCOTT COMMISSIONER
 S/ ______________________ PAMELA T. YOUNG COMMISSIONER